**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

John Doe,

                                    *Plaintiff,*

v.                                                                    **Case No. 3:17-cv-134**
                                                                      **Judge Thomas M. Rose**

University of Dayton, et al.,

                                    *Defendants.*

---

**ENTRY AND ORDER GRANTING MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM BY UNIVERSITY OF
DAYTON, ECF 24, MOTION TO DISMISS FOR FAILURE
TO STATE A CLAIM BY NATIONAL CENTER FOR
HIGHER EDUCATION RISK MANAGEMENT AND
DANIEL C. SWINTON, ECF 25, AND MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM BY JANE ROE, ECF
27 AND TERMINATING CASE.**

---

Pending before the Court are Motions to Dismiss for Failure to State a Claim from two of

the four Defendants: one from the University of Dayton, (ECF 24), one from Defendants the

National Center for Higher Education Risk Management and Daniel C. Swinton, (ECF 25), and

one from Defendant Jane Roe. (ECF 27).     The Amended Complaint states eight claims: Counts I

and II allege defamation *per se* and *per quod* against Jane Roe; Count III alleges breach of contract

against the University of Dayton; Count IV asserts a Title IX, 20 U.S.C. § 1681(a), claim for

hostile environment and discrimination against the University of Dayton; Count V asserts a

claimed violation of Title IX by means of deliberate indifference against the University of Dayton;

Count VI asserts a violation of Title IX by means of erroneous outcome against the University of Dayton; Count VII asserts a claimed violation of Title IX by means of selective enforcement against the University of Dayton; Count VIII claims to be a Declaratory Judgment claim against the University of Dayton seeking injunctive relief; Count IX asserts a breach of contract against NCHERM and Swinton on the theory of Doe being a third party beneficiary; Count X asserts promissory estoppel against the University of Dayton, NCHERM and Swinton in the alternative to Doe's Breach of Contract and Negligence Claims; Count XI asserts negligence against the University of Dayton, NCHERM and Swinton in the alternative to Doe's breach of contract and promissory estoppel claims; Count 12 – Intentional Infliction of Emotional Distress (Against Roe, Dayton, NCHERM and Investigator Swinton) Count XIII - Breach of the Covenant of Good Faith and Fair Dealing (Against Dayton, NCHERM and Swinton).

**Standard**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the adequacy of the pleadings, so a court generally may not consider materials beyond the contested pleading itself in ruling on the motion. See *Winget v. J.P. Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008). However, a court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); see also *Bd. of Trustees Sabis Int'l Sch. v. Montgomery*, 205 F. Supp. 2d 835, 843 (S.D. Ohio 2002) ("[A] court may rely on documents outside the pleadings, if those documents 'simply [fill] in the contours and details of the plaintiff's complaint, and [add] nothing new,' without converting the motion to

dismiss into a motion for summary judgment.") (quoting *Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997)).

**Background**

On September 4, 2016, Plaintiff John Doe and Defendant Jane Roe had a sexual encounter. (Doc. 23 at PageID 820). Later that evening, Roe reported to the University police that she had been sexually assaulted by Doe. (Doc. 23-34 at PageID 1424) On September 14, 2016, the University's Deputy Title IX Coordinator sent Doe a "Notice of Investigation" letter. (Doc. 23-2 at PageID 1014-16) That letter provided Doe a copy of Roe's complaint; directed Doe to the relevant Student Handbook provisions; identified the investigators assigned to the complaint; advised Doe that he could be accompanied by a support person, including an attorney, during any meeting with investigators; advised Doe that he would not be permitted to submit information to the student conduct system outside of the investigation; and generally outlined how the investigation and student conduct process would unfold. (Id.)

According to the University Handbook:

> Whether sexual misconduct has occurred depends in part on whether "effective consent" exists. Effective consent is granted "when a person freely, actively, and knowingly agrees at the time to participate in a particular sexual act with a particular person. Effective consent exists when mutually understandable words and/or actions demonstrate a willingness to participate in mutually-agreed-upon activity at every stage of that sexual activity. Effective consent has time boundaries. Consent at one time does not imply consent at another time. The existence of a dating/romantic relationship between the persons involved or the fact of a previous sexual relationship does not automatically establish effective consent for future sexual activity. There is no consent "when agreement is only inferred from a person's silence or lack of resistance…"

(ECF 23-33 at 3).

The University's student discipline process is governed by the student conduct system outlined in the Student Handbook. (Doc. 23-1 at PageID 916)  The Student Conduct System promises fundamental fairness for all parties concerning allegations of misconduct and encourages students to take responsibility for themselves and their community. (Id.)

Daniel Swinton and Kimberly Bakota conducted the investigation. (Id.)  They conducted their initial interview of Doe on September 27, 2016. (Doc. 23 at PageID 842)  After completing the interview, Swinton and Bakota emailed Doe a copy of their interview notes and allowed Doe to make red-lined changes that he believed were appropriate. (Id.; Doc. 23-2 at PageID 1059-64)  On September 30, 2016, Doe, through his attorney, submitted to the investigators: Doe's written statement; various other witness statements; Doe's red-lined changes to the investigators' interview notes; results of a polygraph examination of Doe; photos of the house where Doe and Roe interacted; various character letters submitted on Doe's behalf; and a position statement authored by Doe's attorney. (Id. at Page ID 843; Doc. 23-2 at PageID 1042-70)

On November 7, 2016, the investigators completed their Investigative Report. (Id. at PageID 843; Doc. 23-34)  Investigators Swinton and Bakota found, when viewing the facts in a light most favorable to the complainant (as the University's policy requires), that probable cause existed to believe that on September 4, 2016, (1) non-consensual sexual intercourse, (2) non-consensual sexual contact, and (3) sexual harassment may have occurred in violation of University policies. (Id. at PageID 1453)  The investigators concluded there was no probable cause to believe Roe was incapacitated due to intoxication such that she was unable to consent to sexual activity. (Id. at PageID 1448- 49)  Rather, the investigators identified the primary issue as whether Roe actually consented to the sexual activity that took place between her and Doe. (Id. at

Page ID 1449)   The matter was referred to the Office of Community Standards and Civility for a hearing. (Id. at PageID 1453)

Doe's hearing took place on December 9, 2016. (Doc. 23 at PageID 853)   On December 12, 2016, the University Hearing Board issued its decision, finding Doe responsible for violating the Student Code of Conduct and issuing the following rationale:

> The University Hearing Board voted that they believed it was more likely than not that [Jane Roe's] version of events in the bedroom occurred specific to non-consensual sexual intercourse. They referenced the agreement of both parties that the complainant indicated she did not think she wanted to do this and indicated that they believed by preponderance of the evidence that [Jane Roe's] version of when and how many times it was said more likely than not occurred.
>
> With regard to non-consensual sexual contact, the board determined that the kissing was consistently described by both parties and was inconsequential compared to the nonconsensual sexual intercourse.   The board made a finding of not responsible on this matter given they fell at 50/50 on the scale of preponderance.

(Doc. 23-37 at PageID 1516)   Doe was suspended until May 1, 2018. (Id. at PageID 1517)   Doe filed an appeal on December 14, 2016, alleging that there were errors in his student conduct proceedings, primarily concerning the investigators' review of polygraph results and Roe's level of intoxication. (Doc. 23-38)   On January 9, 2017, the Judicial Review Committee convened and instructed the Office of Community Standards and Civility to contact Doe and Roe about an error that the Judicial Review Committee identified that occurred at the hearing. (Doc. 23-2 at PageID 1078)   Specifically, the Judicial Review Committee identified that neither Doe nor Roe were given the opportunity to submit questions for the University Hearing Board ("UHB") to consider based upon the live testimony of the witnesses. (Id.)    In order to simulate the live hearing, Doe and Roe were given the opportunity to listen to a recording of the hearing after which they would

each be given one hour to submit questions for the University Hearing Board to consider posing to the witnesses who testified live. (Id.)  Doe submitted his additional questions on January 17, 2017. (Id. at PageID 1084-88)

The UHB members reconvened on January 18, 2017 to review the questions that were submitted. (Id. at PageID 1090)  The UHB determined that none of the additional questions would alter the determinations it had already made and did not ask them. (Id.)  Doe was advised that his suspension would stand. (Id.)

Doe filed a complaint (Doc. 1) in this Court April 20, 2017, which was amended July 30, 2017.  Motions filed by the University of Dayton, ECF 24, the National Center for Higher Education Risk Management and Daniel C. Swinton, ECF 25, and Jane Roe, ECF 27, seek to dismiss all claims.

**Analysis**

Defendants seek to dismiss all claims in Plaintiff's complaint.  The Court will consider each claim seriatim.

**Count I and II—Defamation**

Counts I and II allege defamation *per se* and *per quod* against Jane Roe.  To state a defamation claim under Ohio law, a plaintiff must establish: "(1) a false statement, (2) about the plaintiff, (3) was published without privilege to a third party, (4) with fault or at least negligence on the part of the defendant, and (5) the statement was either defamatory per se or caused special harm to the plaintiff." *Savoy v. Univ. of Akron*, 15 N.E.3d 430, 435 (S.D. Ohio 2014).

Statements made during the University's investigation and judiciary process are privileged and all of Roe's statements are protected by at least a qualified privilege.  Plaintiff alleges in the First Amended Complaint that Roe made allegedly false statements of fact "to fellow [University

6

of] Dayton students indicating that Doe had sexually assaulted her." (Doc. 23, ¶¶116, 118, 121, 122). "Roe also made false statements to numerous people indicating that Doe sexually assaulted her. For example, Roe made such statements to her roommates, RX , HL, and CK, as well as CK's boyfriend, CX.7 Roe also made these false statements to two of her friends, EB and BS." (ECF 23, PageID 821, ¶34.)

Roe asserts privilege. In Ohio:

> If a claimant establishes a prima facie case of defamation, a defendant may then invoke a conditional or qualified privilege. *A & B–Abell*, 651 N.E.2d 1283, citing *Hahn*, 331 N.E.2d 713. In *Hahn*, [the Ohio Supreme Court] stated, "The essential elements of a conditionally privileged communication may accordingly be enumerated as good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only." 43 Ohio St.2d at 246, 72 O.O.2d 134, 331 N.E.2d 713. See *New York Times Co. v. Sullivan*, 376 U.S. 254, (1964) (proof of actual malice is required when a public official brings a defamation claim); *Garrison*, 379 U.S. at 77, (the privilege applies to "anything which might touch on an official's fitness for office"). A qualified privilege may be defeated only if a claimant proves with convincing clarity that a publisher acted with actual malice. *Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 573 N.E.2d 609, paragraph two of the syllabus. Thus, actual malice in the context of a defamation action constitutes an "abuse of privilege." *A & B–Abell*, 73 Ohio St.3d at 11, 651 N.E.2d 1283.

*Jackson v. Columbus*, 883 N.E.2d 1060, 1064 (Ohio 2008).

An allegedly defamatory statement that is absolutely privileged cannot act as a basis for liability. See *M.J. DiCorpo, Inc. v. Sweeney*, 634 N.E.2d 203, 209 (Ohio 1994). Absolute privilege applies to statements, even maliciously false statements, made in the regular course of preparing for or conducting a judicial proceeding, that are pertinent and material to the relief sought and that are published only to persons directly interested in the proceeding. *Michaels v. Berliner*, 694 N.E.2d 519, 522-23 (Ohio Ct. App. 1997). *DiCorpo* held that an affidavit

submitted to a prosecutor reporting the actual or possible commission of a crime was sufficiently related to be considered part of a judicial proceeding. *DiCorpo*, 634 N.E.2d at 209-10. *Hecht v. Levin*, 613 N.E.2d 585, 588 (Ohio 1993), found the filing of a grievance with a local bar association to be part of a judicial proceeding. Absolute privilege also extends to statements made in connection with quasi-judicial proceedings such as grievance proceedings governed by collective bargaining agreements. *Stiles v. Chrysler Motors Corp.*, 624 N.E.2d 238, 242-243 (Ohio Ct. App. 1993) (also finding federal pre-emption of state-law defamation claims where, as here, a private proceeding is mandated by federal law and a powerful federal interest in encouraging its use exists). Ohio treats university disciplinary hearings that provide students with notice, a hearing, and the opportunity to present evidence as quasi-judicial proceedings, and statements in connection with such proceedings are accorded absolute privilege. *Savoy v. Univ. of Akron*, 15 N.E.3d 430, 435 n.3 (Ohio App. 2014).

The University's policies and procedures under which the charge against Plaintiff was processed contained notice, a hearing, and the opportunity to present evidence. Therefore, Roe's alleged statements in the University proceeding, including her initial complaint to the University, her statements to the University and its police department and Title IX office, the investigator NCHERM and its managing partner Swinton hired by the University, and her statements to the University's hearing panel, are absolutely privileged because they were all made to individuals involved in the University's judicial system and were all made in connection with a proceeding within that system.

Roe's alleged statements in connection with the University proceeding are also protected by qualified privilege. Publications made "in a reasonable manner and for proper purpose" are entitled to qualified privilege against defamation liability. *Hahn v. Kotten*, 331 N.E.2d 713, 718

(Ohio 1975). The elements of the qualified privilege are: "good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only." 7 Id. at 719 (citing 50 Am. Jur. 2d Libel and Slander § 195).

The allegations in the First Amended Complaint are that Roe made eight allegedly false statements of fact "to fellow Dayton [University] students indicating that Doe [Plaintiff] had sexually assaulted her." (Doc. 23, ¶¶116, 118, 121, 122). This allegation meets the requirement of publication to individuals other than the University's investigator and administrators. To properly plead a defamation claim, a plaintiff must both adhere to the notice and pleading requirements of Rule 8 and allege all elements of the cause of action. *ConocoPhillips Co. v. Shaffer*, No. 3:05-cv-7131, 2005 WL 2280393, at *1 (N.D. Ohio Sept. 19, 2005). A defamation complaint must allege the substance of the allegedly defamatory statements although they need not be set out verbatim. *Hedrick v. Center for Comprehensive Alcoholism Treatment*, 454 N.E.2d 1343 (Ohio 1982). *Bansal v. Mt. Carmel Health Sys.*, 2011-Ohio-3827, ¶ 40, (Ohio App. 2011). Here, Plaintiff alleges that Roe spoke to identified fellow students about Plaintiff's conduct. Plaintiff sufficiently identifies those other students and when, how, and what was allegedly said.

Moreover, qualified privilege extends to a speaker discussing with close friends and a college's judiciary body whether the speaker was the victim of sexual assault, entitling the speaker to dismissal of defamation claims against her on the grounds of qualified privilege, even in the absence of certainty with regard to good faith. See *Doe v. Salisbury University*, 123 F. Supp. 3d 748, 758-59 (D. Md. 2015). This is particularly true where, as here, Plaintiff admits much of what is alleged to have happened. See PageID 1056-57.

Qualified privilege being a doctrine of public policy, *Hahn*, 331 N.E.2d at 718 (citing 50 Am. Jur. 2d Libel and Slander § 195), it applies to cases such as this, involving sensitive

allegations of sexual assault where someone who is potentially a victim of sexual assault is drawn into a defamation lawsuit for speaking privately about their experiences. See *Doe v. Salisbury*, 123 F. Supp. 3d at 759 ("The Court is mindful of the objectionable policy implications that could follow in a world where such statements are unprivileged.   Victims would have to weigh, on the one hand, the value of reaching out for help in the aftermath of a traumatic sexual assault, and on the other hand the risk that they could be subject to civil liability for defamation if the occurrence of sexual assault is contested by the alleged perpetrator.").   There is no allegation here of wide publication—no article in the student newspaper, no fliers posted around campus, no performance art piece—identifying Plaintiff to the whole community of the University.   Moreover, Roe's claim was adjudicated and Doe's conduct found in violation of school policy in a process that adhered to the standards Plaintiff agreed to under the University's Student Handbook.   As Doe alleges, the Student Handbook is a contractual relationship to which he has agreed; the process it outlines determined his behavior.

The Court doubts an amendment could cure the defects with the defamation claims. Presumably, much of what Plaintiff fears was said, he admits was true.   He has admitted sexual activity that evening.   Beyond that, it is unclear how it could be amended to avoid qualified privilege.   It cannot be that when someone is involved in sexual activity, which arguably turns into unwanted sexual contact, discussing this with a roommate or close friend would open them to a defamation claim.   It cannot be in the public interest that when a student brings a claim of sexual assault in a proper college disciplinary proceeding and has her claim vindicated, she becomes a

ripe target for a retaliatory defamation lawsuit.[1]   For these reasons, Counts I and II of Plaintiff's

First Amended Complaint will be dismissed with prejudice.

### Counts III and IX—Breach of Contract

Doe asserts breach of contract against the University, NCHERM, and NCHERM's

employee, Swinton, who investigated the incident.   The University of Dayton is a private

educational institution.   "Contracts for private education have unique qualities and must be

construed to allow the institution's governing body to meet its educational and doctrinal

responsibilities." *Valente v. Univ. of Dayton*, 438 F. App'x 381, 384 (6th Cir. 2011) (quoting *Ray v.

Wilmington Coll.*, 667 N.E.2d 39, 42 (Ohio App. 1995)).   "Courts therefore will not interfere with a

private university's right to make regulations, establish requirements, set scholastic standards, and

enforce disciplinary rules absent a clear abuse of discretion." *Id.* (citations and internal quotations

omitted).   "The issue here is not whether [the University] could have provided [Doe] with a better

hearing or whether the hearing satisfied the requirements of a formal trial." *Ray*, 667 N.E.2d at 42

(citation omitted).   The issue is also not whether the hearing board should have believed a certain

party's version of the events. See *McDade v. Cleveland State Univ.*, 2014 WL 4557015, at *4

(Ohio App. Sept. 16, 2014).   "Instead, the issue is whether the [hearing] board abused its

discretion." *Ray*, 667 N.E.2d at 42.

"The term 'abuse of discretion' connotes more than an error of law or of judgment; it

implies that the [adjudicating body's] attitude is unreasonable, arbitrary or unconscionable." *State*

---

1 It is entirely conceivable that Plaintiffs state-law claims against Roe are pre-empted, given that they contradict the findings of the process Doe contracted for, under the umbrella of Title IX, and resolution of their truthfulness requires re-opening the Title IX process. Cf., e.g., *Caci v. Laborers Int'l Union of N. Am.*, No. 97-CV-0033A, 2000 WL 424199, at *1–2 (W.D.N.Y. Mar. 31, 2000), aff'd sub nom. *Panczykowski v. Laborers' Int'l Union of N. Am.*, 2 F. App'x 157 (2d Cir. 2001), citing *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246 (1994) (Where resolution of plaintiff's state-law claim depends on interpretation of the labor contract, the claim is pre-empted.).   The Court hesitates to construe the University's sexual misconduct policy to determine whether Roe's statements were true under it.

*v. Adams*, 404 N.E.2d 144, 149 (Ohio 1980). In Ohio, the term means without fair, solid and substantial cause and without reason given; without any reasonable cause; in an arbitrary manner, fixed or done capriciously or at pleasure; without adequate determining principle; not founded in the nature of things; nonrational; not done or acting according to reason or judgment depending on the will alone; absolutely in power; capriciously; tyrannical; despotic. *Gerken v. State Auto Ins. Co. of Ohio*, 20 N.E.3d 1031 (Ohio App. 4th Dist. 2014) (internal citations and quotations omitted). Such a high standard governs this issue because "courts are chary about interfering with academic and disciplinary decisions made by private colleges and universities." *Pierre v. Univ. of Dayton*, No. 3:15-CV-362, 2017 WL 1134510, at *6 (S.D. Ohio Mar. 27, 2017) (citation omitted).

Doe has not pled any facts which could establish that the University acted arbitrarily through its disciplinary proceeding that resulted in finding him responsible for violating the University's Code of Conduct. Other than claiming the University failed to act in a "fair" and "impartial" manner, Doe has not identified a provision of the University's Student Handbook that the University failed to follow during his disciplinary matter. "Vague, hortatory pronouncements in a contract are insufficient to support a breach of contract claim." Id. at *6

Doe decries a multitude of what he perceives as flaws in the University's process, among them that the UHB failed to properly consider evidence and testimony that was presented to it which, according to Doe, could have only led to a finding of non-responsibility; that the University investigators improperly commented on his polygraph results and that the Board mis-utilized and downplayed them; that the investigators did not include any observations on the level of intoxication of Roe, even though intoxication would likely deprive Roe of power to consent under University policy; that investigators allegedly did not make findings sufficient for the matter to

proceed to the Hearing Board since, the investigators wrote "may" instead of "were"; that Doe's request to use bulletin boards for his presentation to the Board was denied.

"There is no requirement, contractual or otherwise, that a finding of [responsibility] in a student disciplinary proceeding must be based on physical evidence. As for assessing the credibility of hearing witnesses, such a determination is well within the discretion of the disciplinary board, and is not for the courts to second guess." *Doe v. Coll. of Wooster*, No. 5:16-CV-979, 2017 WL 1038982, at *11 (N.D. Ohio Mar. 17, 2017). Doe also complains that the questions he submitted to the UHB were not asked verbatim by the UHB. "It is not a due process violation to prohibit students from directly cross-examining each other, witnesses, or University employees." See *Pierre*, 2017 WL 1134510 at *8 (citing *C.Y. ex rel. Antone v. Lakeview Pub. Sch.*, 557 F. App'x. 426, 431 (6th Cir. 2014)).

"Before expelling a student for disciplinary reasons, a public institution must provide: 1) notice of the charges against the student; 2) an explanation of the evidence that authorities have against the student; and 3) an opportunity for the student to present his side of the story." *Pierre*, 2017 WL 1134510, at *8 (quoting *Ashiegbu v. Williams*, 129 F.3d 1263, 1997 WL 720477, at *1 (6th Cir. Nov. 12, 1997)). The University, while not a public institution, provided the above protections.

Doe received notice of the allegations against him no later than September 14, 2016. (Doc. 23-2 at PageID 1014-16) An investigation ensued in which Doe was able to provide a written statement, photos, statements from his own witnesses, polygraph exam results and a position statement authored by his attorney. (Id. at PageID 1042-70) Doe received a copy of the investigative report which went to the hearing panel. (Doc. 23-34) Doe then received an Accountability Hearing, with his attorney present, where he was able to present his side of the

story and highlight any of the inaccuracies or flaws he saw in Roe's story before the UHB.   Doe "'got exactly what he contracted for by way of discipline: . . . process with myriad due process protections, more confidentiality than any criminal defendant gets, and eventual judgment by' a panel of students and University staff." *Pierre*, 2017 WL 1134510, at *9 (quoting *Valente* 689 F. Supp. 2d at 923)).

As regards NCHERM, Plaintiff's third-party beneficiary claim is a breach of contract claim stacked upon a breach of contract claim. Plaintiff asserts when he applied at University of Dayton, he did so with the understanding, in part, if he were alleged to have violated University of Dayton's Policies (i.e., University of Dayton's contracts with Plaintiff), any contract between University of Dayton and a third-party (such as NCHERM) relating to the contractual obligations between Plaintiff and University of Dayton, would be implemented to honor Plaintiff's rights under University of Dayton's Policies and applicable law. (ECF#23 PageID 883, ¶ 177.) However, Plaintiff's contract claim against the University is being dismissed because he did not plead any facts establishing University of Dayton acted arbitrarily. (ECF#24, PageID 1541-54.) Thus, his claim against NCHERM fails, too.

As regards Swinton, Doe points to no exception to the privity requirement that would allow Doe to bring a contract action against him. See *Floor Craft Floor Covering, Inc. v. Parma Cmty. Gen. Hosp. Ass'n*, 560 N.E.2d 206, 208 (Ohio 1990) (*Prosser & Keeton, Law of Torts* (5 Ed. 1984) 657, Section 92).

Because he has not pled any facts which establish that the University acted arbitrarily, Doe's breach of contract claim will be dismissed.

### Count IV—Hostile Environment and Discrimination

Count IV asserts a Title IX, 20 U.S.C. § 1681(a), claim for hostile environment and discrimination against the University of Dayton. A Title IX hostile-environment claim is analogous to a Title VII hostile-environment claim. *Claiborne Cty.*, 103 F.3d at 515; see also *Tumminello*, 678 Fed. Appx. at 284. In order to prevail on a Title IX hostile-environment claim, the plaintiff must allege that his educational experience was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions of the victim's" educational environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted).

Doe does not allege facts that support a reasonable inference that his educational experience was "permeated with discriminatory intimidation, ridicule, and insult." *Harris*, 510 U.S. at 21 (citation and internal quotation marks omitted). See also *Doe v. Miami Univ.*, No. 17-3396, 2018 WL 797451, at *6 (6th Cir. Feb. 9, 2018). The Court need not address whether organizations such as ATIXA are gender-biased organizations, as Doe has not alleged a nexus between the environment at ATIXA and the decision rendered against him. See *Doe v. Colgate Univ.*, 2017 WL 4990629, at *14 (N.D.N.Y. Oct. 31, 2017)

### Count V—Deliberate Indifference

Count V asserts a claimed violation of Title IX by means of deliberate indifference against the University of Dayton. Under the deliberate-indifference theory, a plaintiff must "demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct." *Mallory*, 76 Fed. App'x at 638. Furthermore, a deliberate-indifference claim premised on student-on-student misconduct must allege "harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis v. Monroe Cty. Bd. of Educ.*, 526

U.S. 629, 633 (1999); see also *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 444-45 (6th Cir. 2009). *7 8

"[T]o plead sufficiently a Title IX deliberate-indifference claim the misconduct alleged must be sexual harassment." *Doe v. Miami Univ.*, No. 17-3396, 2018 WL 797451, at *6-7 (6th Cir. Feb. 9, 2018). "Plaintiff's argument, therefore, that he has sufficiently alleged a deliberate-indifference claim based solely on the gender discrimination he asserts occurred throughout the disciplinary process…, fails because the alleged gender discrimination is not tethered to a claim of sexual harassment." *Id.*

### Count VI—Erroneous Outcome

Count VI of Doe's amended complaint alleges that the University violated Title IX under an erroneous-outcome theory of liability. To plead an erroneous-outcome claim, a plaintiff must allege: "(1) 'facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and (2) a 'particularized...causal connection between the flawed outcome and gender bias.' " *Cummins*, 662 Fed. App'x at 452 (quoting *Yusuf*, 35 F.3d at 715).

The Court will assume Doe has alleged an articulable doubt on the accuracy of the disciplinary proceeding. Some courts have posited that a plaintiff "can satisfy this element in a number of ways including: (i) pointing to procedural flaws in the investigatory and adjudicative processes, (ii) noting inconsistencies or errors in the adjudicator's oral or written findings, or (iii) challenging the overall sufficiency and reliability of the evidence." *Doe v. Marymount University*, 1:17-cv-401 at 16, PageID 1847 (E.D. Va. March 14, 2018). Notably, Doe does not allege that the investigative and adjudicative procedures violated those established contractually by the student handbook. Doe decries aspects of the procedure he was afforded, and asserts that it

resulted in an incorrect result.   In a word, he believes the disciplinary board should have credited his plausible version of events over Roe's.

Doe must also allege facts showing "a 'particularized ... causal connection between the flawed outcome and gender bias.'" *Cummins*, 662 Fed. App'x at 452 (quoting *Yusuf*, 35 F.3d at 715).   "Such allegations might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Doe v. Miami Univ.*, No. 17-3396, 2018 WL 797451, at *9 (6th Cir. Feb. 9, 2018) (quoting *Yusuf*, 35 F.3d at 715).

Doe alleges, "[u]pon information and belief," that in "virtually all cases of campus sexual misconduct [at the University of] Dayton, the accused student is male and the accusing student is female." Amended Complaint, ¶ 139, PageID 875.   This however, is not the type of pattern that would show an improper influence of gender.   Indeed, this, sadly, is just what the Court would expect.   According to the Department of Justice, over 95% of sexual assaults are perpetrated by males, while fewer than 3% are by females. U.S. Department of Justice, Bureau of Justice Statistics. Criminal Victimization in the United States, 2006. Bureau of Justice Statistics; Washington, DC.: 2007c, Table 38, https://www.bjs.gov/content/pub/pdf/cvus06.pdf.   A pattern that would support a claim would involve, for example, prosecutions for sexual assault of females students by Montgomery County that the University of Dayton refused to consider.

Doe points to a Department of Education "Dear College" letter as evidence of gender bias. It alleges that the letter caused other universities to change their standard of evidence required to show a violation.   Doe cites the Court to *Doe v. Washington & Lee Univ.*, (Br. at 18-19) a case where Washington & Lee "made changes that one could infer were designed to secure more convictions. W & L removed protections that had previously been afforded to the accused, such as

the right to counsel, and adopted a low burden of proof, preponderance of the evidence, rather than the beyond a reasonable doubt standard used for honor code violations." *Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 WL 4647996, at *9 (W.D. Va. Aug. 5, 2015). There is no allegation here, however, that the University of Dayton, unlike other universities that received the letter, changed its standard of evidence or any other procedural rules.

As to the allegations attacking the Department of Education letter:

> All of those high-level allegations do little to advance the actual gender discrimination claim at issue in this case. With the conclusory characterizations (as distinct from factual allegations) of "anti-male" bias set to the side, these allegations do not plausibly allege anti-male bias. For example, the allegations concerning the Department of Education at most raise the prospect that OCR believes that campus sexual assault of women is a problem. The University's adoption of positions recommended by the federal government does not in turn suggest that the University did so because of gender bias—all it plausibly suggests is that the University sought to comply with OCR's recommendations for handling sexual-assault complaints. Similarly, the gender-pronoun allegations about the organizations in which Inabinet is (or was) a member suggest only that both organizations believe that women are more likely to be accusers of sexual violence and men are more likely to be the accused. The Amended Complaint does not assert otherwise, nor does any allegation in the Amended Complaint even imply otherwise. And despite the Amended Complaint's conclusory characterization of [various awareness campaigns] as anti-male, the factual allegations do not plausibly suggest that is so. … Even more importantly, again there is no allegation that the University sponsored those initiatives with the intent to discriminate against males. All in all, John Doe's allegations about the University's general climate do not give rise to any plausible inference of anti-male (or pro-female) bias on the part of the University.

*Doe v. Univ. of Chicago*, No. 16 C 08298, 2017 WL 4163960, at *5 (N.D. Ill. Sept. 20, 2017). Likewise here, Doe's allegations do not give rise to a plausible inference of gender bias on the part of the University.

**Count VII—Selective Enforcement**

Count VII asserts a claimed violation of Title IX by means of selective enforcement against the University of Dayton. To prevail on a selective enforcement claim, the plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender. *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016)(citing *Mallory*, 76 Fed. App'x at 641; *Marshall*, 2015 WL 7254213, at *6.). Doe's amended complaint alleges that similarly-situated females were treated more favorably than him, ¶167-70, but identifies none. "[B]ecause Plaintiff has not specifically identified a female student who was accused of violating [the University]'s Code of Student Conduct and was not dismissed from [the University], the Court finds that Plaintiff has not sufficiently pled a claim for Title IX hostile environment/sexual harassment." *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1067-68 (S.D. Ohio 2017)(Smith, J.). Cf. *Doe v. Miami Univ.*, 882 F.3d 579, 595 (6th Cir. 2018) ("John alleges three instances when the defendants treated him differently from those similarly situated without any rational basis for the treatment."). Because Doe does "not allege that a similarly accused female was treated differently under [the University's] disciplinary process, the 'selective enforcement' standard is inapplicable." *Doe v. Cummins*, 662 F. App'x 437, 452 n.10 (6th Cir. 2016).

**Count VII—Declaratory Judgment**

Count VII seeks declaratory judgment against the University. Because all of Plaintiff's substantive claims are subject to dismissal and the Federal Declaratory Judgment Act is procedural only and does not create an independent cause of action, Doe's claim for declaratory judgment will be dismissed. See *Schilling v. Rogers*, 363 U.S. 666, 679 (1960).

**Count X—Promissory Estoppel**

Ohio law recognizes that a Student Handbook at an institution of higher education creates a contractual relationship between the institution and the student. See *Valente*, 438 F. App'x at 384. "[T]he presence of an enforceable contract between [University of] Dayton and [the student plaintiff] generally precludes promissory-estoppel claims relating to the contract." Id. at 386 (citing *O'Neill v. Kemper Ins. Cos.*, 497 F.3d 578, 583 (6th Cir. 2007)). Because there is an enforceable contract between Doe and the University as it relates to the discipline issued by the University, there is no basis for a promissory estoppel claim. Further, Doe makes no allegations in his Amended Complaint which support a promissory estoppel claim. Rather, his promissory estoppel claim is "premised on the same allegations that support plaintiff's breach of contract claim—the terms of the disciplinary process set forth in the Student Handbook." *Doe v. Coll. of Wooster*, 2017 WL 1038982, at *12 (N.D. Ohio 2017) (Lioi, J.). "However, Ohio law bars a promissory estoppel claim when there is an express contract between the parties." *Id.* (citation omitted). Thus, Doe's promissory estoppel claim fails as a matter of law.

**Count XI—Negligence**

Count XI asserts negligence against the University of Dayton, NCHERM and Swinton in the alternative to Doe's breach of contract and promissory estoppel claims. Where a relationship is contractual in nature, tort claims which involve the same course of events fail to state a claim. See *Valente*, 438 F. App'x at 386 ("Because, as we explained, the relationship between a university and its students is contractual and all of Valente's claims arise from the same course of events (namely, his suspension from [the University of Dayton School of Law] for Honor Code violations), we could dispose of his tort claims summarily.") (internal citation omitted).

"None of the[] actors had any duty to Plaintiff which was allegedly breached except for duties imposed on them by their roles in carrying out the contractual relationship between the

parties." *Valente*, 689 F. Supp. 2d 910, 924 (S.D. Ohio 2010). This Court concluded "that Ohio courts would not recognize causes of action for negligence against the University of Dayton for the asserted negligence of its agents in performing their parts in the contractual relationship with Plaintiff." *Id.* In an attempt to recast his breach of contract claim as a negligence claim, Doe asserts that University officials were negligent in performing their duties pursuant to the Student Handbook. Doe may not attempt to use a negligence claim to reassert his contractual claim. See *Pierre*, 2017 WL 1134510, at *9 (holding that the plaintiff failed to state a negligence claim upon which relief could be granted where he was "trying to use a negligence claim as another means to assert his other contract claims"); *Valente*, 438 F. App'x at 387 ("Because the duties Valente identifies all arise from his contractual relationship with Dayton, he proffers no grounds upon which to base a negligence action.").

Moreover, a claim for negligence in the university-student context is not cognizable under Ohio law because Ohio courts have recognized that such a claim "is essentially one of educational malpractice" which is not recognized in Ohio. See *Lemmon v. Univ. of Cincinnati*, 750 N.E.2d 668, 672 (Ohio Ct. Cl. 2001) (citing *Malone v. Academy of Court Reporting*, 582 N.E.2d 54, 58 (Ohio App. 1990)).

**Count XII—Intentional Infliction of Emotional Distress**

Count XII alleges Intentional Infliction of Emotional Distress against Roe, Dayton, NCHERM and Investigator Swinton. In Ohio, a person is liable for the intentional infliction of emotional distress when he or she "by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Kovacs v. Bauer*, 80 Ohio St. 3d 1224, 1227 (1998). For conduct to be considered "extreme and outrageous," it must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Yeager v. Local Union*

*20, Teamsters*, 6 Ohio St. 3d 369, 375 (1983). Doe alleges nothing so extreme in degree as to go beyond the all possible bounds of decency. His Intentional Infliction of Emotional Distress claim will be dismissed.

### Count XIII—Breach of the Covenant of Good Faith and Fair Dealing

Count XIII alleges Breach of the Covenant of Good Faith and Fair Dealing against Dayton, NCHERM and Swinton. Breach of the covenant of good faith and fair dealing is not a stand-alone claim. See *Alshaibani v. Litton Loan Serv., LP*, 528 F. App'x. 462, 465 (6th Cir. 2013) ("The district court properly dismissed Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing because, under Ohio law, a breach-of-contract claim subsumes any claim for breach of the duty of good faith and fair dealing.") (citation omitted).

### Conclusion

Because none of Plaintiff John Doe's claims allege sufficient facts, Motion to Dismiss for Failure to State a Claim by University of Dayton, ECF 24, Motion to Dismiss for Failure to State a Claim by National Center For Higher Education Risk Management and Daniel C. Swinton, ECF 25, and Motion to Dismiss for Failure to State a Claim by Jane Roe, ECF 27, are **GRANTED**. The Clerk is **ORDERED** to **TERMINATE** the instant action from the dockets of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, March 20, 2018.


s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE